IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LANCE E. AMUNDSON,

        Plaintiff,

v.                                                                                          13-cv-01286-PK

CAROLYN W. COLVIN,                                                 FINDINGS AND
Acting Commissioner of Social Security,                        RECOMMENDATION

        Defendant.

---

PAPAK, Magistrate Judge:

        Plaintiff Lance E. Amundson filed this action July 20, 2013, seeking judicial review of

the Commissioner of Social Security's (the "Commissioner") final decision denying his

application for Title XVI supplemental security income disability insurance benefits ("SSI")

under the Social Security Act (the "Act"). This court has jurisdiction over the plaintiff's action

pursuant to 42 U.S.C. § 405(g).

        Amundson argues that the Commissioner erred by rejecting the medical opinions of his

examining physicians, discrediting his pain and symptom testimony, finding that he did not meet

the regulatory listings of impairments, and failing to consider his lack of education and

transferable work skills. I have considered all of the parties' briefs and all of the evidence in the

administrative record. For the reasons set forth below, the Commissioner's final decision should

be affirmed.

## DISABILITY ANALYSIS FRAMEWORK

        To establish disability within the meaning of the Act, a claimant must demonstrate an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 416.920(a)(4).  At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the administrative law judge ("ALJ") considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 416.920(a)(4)(i).  If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 416.920(a)(4)(ii).  An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(c).  The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); *see also Bowen*, 482 U.S. at 141.  If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c).  Nevertheless, it is well established that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482. U.S. at 153–154.  "An

impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work." *Id.*, *quoting* SSR 85-28, 1985 WL 56856 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. § 416.945(a); *see also* SSR 96-8p, 1996 WL 374184 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f). In the event the claimant is

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184 (July 2, 1996).

no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner meets her burden to demonstrate the existence in significant numbers in the national economy of jobs capable of being performed by a person with the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the claimant is found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an ALJ's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *quoting Reddick v.*

*Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of

the Commissioner. *See id., citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253

F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is

immaterial that the evidence may be "susceptible [of] more than one rational interpretation."

*Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d

1450, 1453 (9th Cir. 1984).

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the ALJ found that

Amundson did not engage in substantial gainful activity at any time following his alleged

disability onset date of August 12, 2009. Tr. 38. He therefore proceeded to step two of the

analysis.

At the second step, the ALJ found that Amundson's fused right ankle and inactive

hepatitis C were "severe" for the purposes of the Act. Tr. 38. He further found that Amundson's

alcoholism was in remission and therefore was not, by itself, severe. Tr. 38. Likewise, the ALJ

found that Amundson's clavicle fracture was not severe, as it could not be expected to persist for

twelve continuous months.[2] Tr. 39.

At the third step, the ALJ found that none of Amundson's impairments, individually or in

combination, equaled any of the impairments enumerated in 20 C.F.R Part 404, Subpart P,

Appendix 1. Tr. 39. In reaching this conclusion, the ALJ found that the opinions of the state

agency medical consultants and examining physician Kathie Lang, M.D., were "in no way

---

[2] Amundson does not appear to challenge this finding. However, to the extent that any of Amundson's broad
assignments of error could be read to encompass this aspect of the ALJ's decision, I agree with the ALJ that the
documented medical improvements in Amundson's clavicle are substantial evidence that the impairment could not
be expected to last for twelve months. *See* Tr. 39. Therefore, the ALJ did not err in his consideration of
Amundson's fractured clavicle. *See* 42 U.S.C. § 423(d)(1)(A) (defining disability as the "inability to engage in any
substantial gainful activity by reason of any medically determinable physical or mental impairment which can be
expected . . . to last for a continuous period of not less than 12 months.").

consistent with a finding of a listing-level impairment." Tr. 39.

The ALJ then conducted an assessment of Amundson's RFC. Tr. 39. The ALJ

determined that:

> [T]he claimant has the residual functional capacity to perform a wide range of sedentary
> work as defined in 20 C.F.R. § 416.967(a), in that he can lift and/or carry and push and/or
> pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk (with normal
> breaks) two hours in an eighty-hour day; and sit (with normal breaks) six hours in an
> eight-hour day. He can never climb ladders, ropes, or scaffolds. He can occasionally
> climb ramps and stairs, stoop, kneel, and crouch. In addition, he should avoid hazards
> such as heights and moving machinery.

Tr. 39. In reaching this conclusion, the ALJ accepted the functional assessments offered by the

state agency medical consultants. Tr. 39. The ALJ determined that those assessments were

consistent with Lang's assessment and were otherwise supported by the record as a whole. Tr.

39.

At the fourth step, the ALJ found that Amundson had no past relevant work. Tr. 42.

Accordingly, the ALJ proceeded to the fifth step, where he determined that Amundson was able

to perform jobs existing in significant numbers in the national economy. Tr. 43. In reaching this

conclusion, the ALJ relied on the testimony of the vocational expert. Tr. 43.

The vocational expert testified that an individual with Amundson's age, education, work

experience, and RFC would be able to perform the representative occupations of small products

assembler (600 positions locally and 22,000 positions nationally); electronics worker (300

positions locally and 8,800 positions nationally); semiautomatic sewing-machine operator (400

to 500 positions locally and 29,000 positions nationally); final assembler in the optical goods

industry (30 positions locally and 2,500 to 3,000 positions nationally); charge-accountant clerk

(3,100 positions locally and 24,000 positions nationally); and bench assembler (35 positions

locally and 1,100 to 1,200 positions nationally). Tr. 43–44. Consequently, the ALJ concluded

that Amundson was not disabled as defined in the Act at any time between August 12, 2009, and

PAGE 6 – FINDINGS AND RECOMMENDATIONS

October 14, 2011. Tr. 18–19, 44.

## SUMMARY OF ADMINISTRATIVE RECORD[3]

Amundson was born on July 28, 1962. Tr. 5.[4] He has not received any formal education beyond the tenth grade but is able to read, write, and speak in English at a basic level. Tr. 5, 134, 198. Amundson has been unemployed since 1985. Tr. 11, 118–120, 136, 143. His work history includes employment as a cook, bartender, and dishwasher. Tr. 11, 136, 143. Amundson reported earning $243.41 in 1980, $1,054.45 in 1984, and $2,196.84 in 1985. Tr. 119. He did not report earnings for 1981 through 1983 or any year following 1985. Tr. 118–119. At the administrative hearing on his SSI application (the "hearing"), Amundson testified that he did not report some of his earnings prior to 1987 because his jobs at the time paid "under-the-table." Tr. 13. He also testified that, in 1999, he tried to earn money by mowing lawns and cutting wood but could not "handle it." Tr. 6, 11.

In 1987, Amundson injured his right ankle in a motorcycle accident. Tr. 214. As a result, he underwent four operations on his right ankle, including a fusion surgery, over the succeeding two years. Tr. 135, 215. Consequently, Amundson's right ankle is permanently fused. Tr. 197, 201. Amundson testified at the hearing that his ankle pain had spread to his neck and lower back and that the pain made it difficult to sit for longer than forty-five minutes. Tr. 7, 8, 11. When the ALJ asked Amundson what efforts he had made in the years following his ankle injury to find a job that accommodated his impairment or to otherwise improve his quality of life, Amundson candidly answered: "The only improvement I've [made] is being a grandpa I guess. . . . I don't get paid for it. . . . I quit my drinking and my drug using, and pretty much I just

---

[3] The following recitation constitutes a summary of the evidence contained within the Administrative Record, and does not reflect any independent finding of fact by the court.
[4] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 10.

stand tall on that one." Tr. 13.

On March 8, 1989, Amundson was awarded disability insurance benefits ("DIB") based on his ankle injury. Tr. 12, 123, 215. Those benefits were terminated in October 1997, when the Commissioner determined that, due to Amundson's successful ankle surgeries and subsequent medical improvements, he was capable of performing sedentary work. Tr. 215. Although Amundson did not appeal the Commissioner's October 1997 decision, Tr. 12, he reapplied for DIB on May 9, 2002, April 14, 2004, and May 28, 2004. Tr. 122–123. The Commissioner denied each of those applications. Tr. 122–123.

At some time prior to 2007, Amundson was diagnosed with hepatitis C. Tr. 138. In a pain and fatigue questionnaire, Amundson reported experiencing increased fatigue since 2006, which prevented him from completing tasks in a timely manner. Tr. 177.

On August 12, 2009, Amundson protectively filed an application for SSI, alleging a disability onset date of August 12, 2009.[5] Tr. 48, 92, 112. In support of his application, Amundson filed a Disability Report (Form SSA-3368), claiming his ability to work was limited by hepatitis C, back pain, neck pain, and a fused right ankle. Tr. 135. He reported that his hepatitis C limited his appetite and caused him fatigue. Tr. 135. With respect to his ankle injury, Amundson reported that he could not walk farther than one and one-half blocks without being incapacitated for three days by "horrible pain." Tr. 135. He further reported being unable to walk up stairs, put weight on his right ankle, or stand comfortably for more than a half hour. Tr. 135. Additionally, Amundson reported that he was developing problems in his left leg from using it to compensate for the lack of mobility in his right ankle. Tr. 135.

On October 14, 2009, Kathie Lang, M.D., preformed a consultative orthopedic

---

[5] It is the Commissioner's denial of Amundson's SSI application of August 12, 2009, that is at issue in these proceedings.

examination of Amundson at the request of the state agency. Tr. 197–201. Amundson reported

pain in his ankle, leg, knee, lower back, and neck. Tr. 197. He further reported that "any amount

of standing or walking" caused pain in his right ankle. Tr. 197. However, Lang noted that

Amundson did not use an ambulatory aid, such as a cane or crutches. Tr. 198. She further noted

that Amundson had not been taking any prescription medications and only used ibuprofen and

Tylenol "from time to time." Tr. 197. Lang confirmed that Amundson's right ankle was fused,

finding that it did "not move whatsoever." Tr. 198. However, Lang also determined that

Amundson could rise from a sitting to a standing position "without difficulty." Tr. 198.

With respect to Amundson's back and neck pain, Lang administered a straight leg raise

test, and the result was negative, suggesting that Amundson did not have a herniated disk. Tr.

198. Likewise, Lang determined that Amundson's sensations and reflexes were intact and that

there was no obvious muscle atrophy, spasms, or deformities, except in the right ankle. Tr. 198.

In fact, with the exception of his right ankle, Lang concluded that Amundson had "fairly good

strength in all muscle groups" and rated Amundson's muscle strength at "4 out of 5." Tr. 198.

Lang further concluded that Amundson had reduced range of motion in his back, neck, and hip

and suffered from significant low back and neck pain. Tr. 198.

Amundson also reported to Lang that he had been diagnosed with hepatitis C but had not

undergone a liver biopsy or any treatment for the condition. Tr. 197. Upon examination, Lang

diagnosed Amundson with inactive hepatitis C. Tr. 201.

Lang then provided the following functional assessment:

When patient stands he stands with all the weight on his left foot due to pain in the right
ankle. He can walk approximately a block. He can sit but has to change positions due to
back pain about every 30 minutes. He has no trouble with hearing or speaking. He can
lift 20 pounds. If he does this very often he states that [it] would make his back more
sore. He can manipulate or handle objects with his hands fine. He could travel for about
an hour and then he would have to get up and change positions.

Tr. 198. Notwithstanding her opinion that Amundson could lift twenty pounds, Lang went on to

conclude that Amundson could not perform work that involved any amount of standing or lifting.

Tr. 198. Lang did not explain the inconsistency in her opinions about Amundson's ability to lift.

Similarly, she did not explain her contradictory opinions about Amundson's ability to sit—that

he could only sit for a half hour without changing positions, unless he was traveling, in which

case he could sit for a full hour.

On November 5, 2009, state agency medical consultant Neal Berner, M.D., reviewed

Lang's October 14, 2009, examination notes and Amundson's reports to the Social Security

Administration (the "Administration"). Tr. 213. Berner determined that Amundson was able to

perform sedentary work, opining that he could occasionally lift and carry twenty pounds,

frequently lift and carry ten pounds, stand and walk at least two hours per eight-hour workday,

and sit about six hours per eight-hour workday. Tr. 207. Berner also opined that Amundson

could frequently kneel and crawl; occasionally climb ramps and stairs, balance, stoop, and

crouch; and never climb a ladder, rope, or scaffolds. Tr. 208. That same day, the Administration

notified Amundson of its decision to deny his application for SSI. Tr. 57.

Amundson requested reconsideration of his SSI application on December 1, 2009. Tr.

63. On April 7, 2010, state agency medical consultant Richard Alley, M.D., reviewed

Amundson's medical records and recommended affirming the initial sedentary RFC

determination. Tr. 215. The following day, April 8, 2010, the Administration notified

Amundson of its decision to affirm its initial non-disability determination. Tr. 64.

On March 30, 2010, Amundson consulted with family nurse practitioner Steve Eddy. Tr.

214. Amundson reported that, since his last ankle surgery (in 1989), he had "done fairly well"

but that his bike had been stolen recently, which required him to walk more, causing increased

pain and discomfort. Tr. 214. Eddy noted that Amundson's use of pain medication was "rare" and that he was not a "chronic pain medication person." Tr. 214. Eddy diagnosed Amundson with "[a]cute chronic ankle pain." Tr. 214.

Amundson returned to Eddy on July 27, 2011, requesting "documentation of chronic pain." Tr. 220. Amundson reported ongoing pain in his right ankle, which he claimed recently began traveling up his leg and into his back and neck. Tr. 220. He attributed the pain to his gait being altered by his ankle fusion and reported primarily controlling the pain with medical marijuana. Tr. 220–222. He stated that it had been over one year since he last received a prescription for Vicodin, which he reported taking "only when symptoms flare[d]." Tr. 222. Eddy determined that Amundson "may be developing chronic regional pain syndrome" and prescribed Vicodin. Tr. 222.

On July 30, 2011, Amundson was admitted to the emergency room at Sky Lakes Medical Center with a fractured left clavicle, the result of a bicycle accident. Tr. 7, 223. Amundson reported experiencing moderate pain and presented bruising and decreased mobility in his left shoulder. Tr. 223, 225. X-rays revealed no joint displacement or bone lesions. Tr.227– 228. Amundson appeared for a follow-up appointment on August 8, 2011, where the attending physician determined that he was in stable condition. Tr. 233. Amundson appeared for an additional follow-up appointment on August 29, 2011, where the attending physician determined that his condition had further improved. Tr. 241. At the hearing, Amundson testified that a nerve was caught in his clavicle fracture, and as a result, he was losing the use of his left arm. Tr. 6–7. He further testified that he did not plan to have the condition treated, as he could not afford it. Tr. 8–9.

On October 6, 2011, ALJ Philip Simon presided over a hearing on Amundson's SSI

application.  Tr. 3.  Amundson was represented by legal counsel.  Tr. 3.  A vocational expert also testified at the hearing.  Tr. 3, 88.  On October 14, 2011, the ALJ issued a decision denying Amundson's SSI application.  Tr. 44.

On March 15, 2012, Amundson filed a request for review of the ALJ's decision.  Tr. 25. The request was untimely.  Tr. 29, 110.  However, the Appeals Council found good reason for the delay, as Amundson did not receive timely notice of the ALJ's decision due to a change of address.  Tr. 29, 110.  Therefore, the Appeals Council considered Amundson's request for review.  On June 20, 2013, the Appeals Council denied Amundson's request for review.  Tr. 25. As a result, the ALJ's October 14, 2010, decision became the Commissioner's final decision for the purpose of judicial review.  *See* 20 C.F.R. § 422.210(a).  This action followed.

## ANALYSIS

### I.    Medical Opinions

Amundson first argues that the ALJ erred by rejecting the medical opinions of Lang and Eddy.  Similarly, Amundson contends that the ALJ made independent medical findings and relied on speculative inferences from the medical evidence.  An ALJ must provide specific and legitimate reasons for rejecting an examining physician's contradicted medical opinion or conclusion on the ultimate issue of disability.  *See Lester v. Chater*, 81 F.3d 821, 830–831 (9th Cir. 1995).

In this case, the ALJ's silent rejection of Lang's medical opinion was harmless error.  As stated above, Lang opined that Amundson could lift twenty pounds and walk approximately one block.  Tr. 198.  Inexplicably, Lang also opined that Amundson could not perform work that involved *any amount* of standing or lifting.  Tr. 198.  This latter part of Lang's opinion is tantamount to a conclusion on the ultimate issue of disability, as even sedentary work requires

some standing and lifting. *See* 20 C.F.R. § 416.967(a). Although the ALJ never expressly rejected or assigned weight to Lang's conclusion, he clearly did not credit it, as he determined that Amundson could perform sedentary work. As stated above, the state agency medical examiners opined that Amundson could perform sedentary work, thereby contradicting Lang's conclusion. Consequently, the ALJ was required to provide specific and legitimate reasons for rejecting Lang's conclusion. *See Lester*, 81 F.3d at 830–831.

Of course, the ALJ could have rejected Lang's conclusion because it was inconsistent with the functional assessment she provided in the same letter. *See, e.g., Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). However, the court is constrained to review the reasons asserted by the ALJ. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). The ALJ's silent disregard of Lang's opinion was therefore erroneous. *See Lester*, 81 F.3d at 830–831. However, the error was harmless because, as discussed below, the ALJ properly rejected Amundson's allegation that he was unable to perform all work because of his ankle, back, and neck pain. *See* Tr. 40; *infra* pp. 15–19; *Molina v. Astrue*, 674 F.3d 1104, 1121 (9th Cir. 2012) ("[W]here the ALJ rejects a witness's testimony without providing germane reasons, but has already provided germane reasons for rejecting similar testimony, we cannot reverse the agency merely because the ALJ did not 'clearly link his determination to those reasons.'"), *quoting Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001).[6]

The ALJ did not err in his treatment of Eddy's opinion. In his opening brief, Amundson

---

[6] *Stout v. Comm'r, Soc. Sec. Admin.*, ostensibly suggests that the ALJ committed reversible error by silently rejecting Lang's conclusion. *See* 454 F.3d 1050, 1056 (9th Cir. 2006) ("[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."). However, in *Molina*, the Ninth Circuit abandoned the unusual harmless error standard articulated in *Stout* and returned to its long-standing "inconsequential to the ultimate nondisability determination" standard. 674 F.3d at 1115–1121. To that end, *Molina* limited *Stout* to cases where the silently rejected opinion (1) identifies limitations not considered by the ALJ, (2) is uncontradicted by anything in the record, and (3) is highly probative of the claimant's inability to work. *See id.* at 1116. None of those factors are present in this case, and therefore, *Stout* is not controlling.

quotes the following language from Eddy's treatment notes:

> [Amundson] [h]as done fairly well until his bike was stolen recently and he has had to walk more and he is not tolerating this well. He has not been there [Klamath Medical Clinic] for quite some time due to lack of insurance. I reviewed records that he hand-carried from that clinic, they substantiate his history. He has had pain medication through that clinic but it has been rare[ . . . .]

Pl.'s Opening Br. 4 (third alteration in original; internal quotation marks omitted).  However, as the Commissioner points out, Amundson does not explain the significance of the quoted language.  Following analysis of the administrative record and Amundson's brief, I—like the Commissioner—am unable to ascertain any argument or assignment of error regarding Eddy's opinion.[7]  Consequently, Amundson has waived any challenge to the ALJ's treatment of Eddy's opinion.  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008), *citing Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003); *Luttrell v. Comm'r of Soc. Sec. Admin.*, 1:12-CV-2180-TC, 2014 WL 878845, at *2 (D. Or. Mar. 4, 2014) (citations omitted).

Additionally, I reject Amundson's argument that the ALJ "improperly substituted his own opinion for that of the [c]laimant's treating and examining medical sources of record, by making and relying on his own independent medical findings and speculative inferences from the medical evidence."  Amundson's support for this argument is entirely inapposite.  There is simply no evidence or suggestion in the record that the ALJ's decision was based on his own independent medical findings or speculative inferences from the medical evidence.

## II.    Amundson's Credibility

Amundson further argues that the ALJ erred by rejecting his pain and symptom testimony without clear and convincing reasons.  The Ninth Circuit recently reiterated the standards

---

[7] If fact, the ALJ properly used much of the quoted language to support his non-disability determination. *See* Tr. 40–41.

governing an ALJ's assessment of a disability claimant's credibility:

> In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. *Vasquez v. Astrue,* 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether there is "'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Lingenfelter v. Astrue,* 504 F.3d 1028, 1036 (9th Cir. 2007)). If the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "'specific, clear and convincing reasons'" in order to reject the claimant's testimony about the severity of the symptoms. *Id.* (quoting *Lingenfelter,* 504 F.3d at 1036).

*Molina,* 674 F.3d at 1112. In this case, after finding that Amundson's medically determinable impairments caused symptoms that could reasonably be expected to produce his pain, the ALJ determined that Amundson's conservative course of treatment, daily activities, and poor work history undermined his allegations of disabling pain. Tr. 40–42.

### A.    Conservative Course of Treatment

A claimant's adherence to a conservative course of treatment can be a clear and convincing reason for discounting the claimant's credibility. *See Bunnell v. Sullivan,* 947 F.2d 341, 346 (9th Cir. 1991), *quoting Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989). Before discrediting a claimant because of conservative treatment, the ALJ must first examine the medical conditions and personal factors that bear on whether the claimant can reasonably remedy his impairment. *See Gamble v. Chater,* 68 F.3d 319, 321 (9th Cir. 1995); *Dodrill v. Shalala,* 12 F.3d 915, 919 (9th Cir. 1993). However, a claimant's failure to assert a legitimate reason for following a conservative course of treatment, or a finding by the ALJ that the alleged reason is not believable, "can cast doubt on the sincerity of the claimant's pain testimony." *Fair,* 885 F.2d at 603.

In this case, Amundson's adherence to a conservative course of treatment is a clear and convincing reason for discounting his credibility. The ALJ determined that it was "significant that in the more than two decades since the claimant's last surgery, he ha[d] made no efforts to

PAGE 15 -- FINDINGS AND RECOMMENDATIONS

rehabilitate his right ankle." Tr. 41. Amundson only sought post-surgery treatment for his ankle twice.[8] Tr. 40. The first time was when he consulted with Eddy on March 30, 2010—twenty-one years after his last ankle surgery. Tr. 41, 214, 220. Amundson even admitted at this appointment that he had "done fairly well until his bike was stolen recently and he [had] to walk more." Tr. 214. The second and final time Amundson sought post-surgery treatment of his ankle was when he returned to Eddy on July 21, 2011. Tr. 220. Here, the recorded reason for Amundson's visit was not treatment of his ankle impairment. Rather, as the ALJ noted, it was: "needs documentation of chronic pain." Tr. 41, 220.

Additionally, Amundson reported using prescription pain medications rarely and only using ibuprofen and Tylenol "from time to time." Tr. 40–41. Similarly, although Amundson complained of pain and difficulty walking, he did not use ambulatory aids. Tr. 41. Thus, there is substantial evidence that Amundson consistently adhered to a conservative course of treatment. Consequently, the ALJ was entitled to discredit Amundson's pain and symptom testimony unless Amundson proved a legitimate reason for failing to treat his impairments more aggressively. *See Gamble*, 68 F.3d at 321; *Dodrill*, 12 F.3d at 919.

Amundson argues that financial hardship mandated his conservative course of treatment. Of course, an ALJ cannot use a claimant's inability to afford medical care as a reason for discrediting his testimony. *See Gamble*, 68 F.3d at 321. However, in this case, the ALJ expressly stated that he did not use "the possible lack of access to care as a factor against the claimant." Tr. 41. The ALJ simply found Amundson's justification was pretextual, concluding that "the lack of treatment at least tends to indicate that his symptoms were not as severe as he alleged." Tr. 41.

---

[8] The ALJ properly determined that Amundson's October 14, 2009, consultation with Lang was not for the purpose of treating his ankle. Tr. 40–41. As stated above, Amundson attended that appointment at the request of the state agency upon his initial application for disability benefits. Tr. 40, 197.

Substantial evidence supports the ALJ's finding that financial hardship did not adequately explain Amundson's conservative course of treatment. For example, as the ALJ noted, although Amundson did not treat his pain with prescription medication or medical devices, he "reported primarily caring for his symptoms with marijuana," which presumably costs money. Tr. 41. Likewise, Amundson neglected to treat his pain even with over-the-counter medication, which would not have required a doctor appointment or health insurance. Tr. 197. Therefore, the ALJ was entitled to rely on Amundson's conservative course of treatment as a basis for his adverse credibility finding. *See, e.g., Fair*, 885 F.2d at 603.

**B.    Daily Activities**

An ALJ may support an adverse credibility determination by identifying inconsistencies or contradictions between the claimant's complaints and his activities of daily living. *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). In this case, Amundson's daily activities were a clear and convincing reason for discounting his credibility. The ALJ determined:

> [T]he claimant's daily activities are inconsistent with his alleged degree of impairment and further support the residual functional capacity given above. He reported . . . that he is able to tend to his personal care and do household chores, including washing the dishes, cleaning the kitchen, and sweeping the floor, although these activities take longer than they used to [Tr. 126–128, 150–152, 177]. He prepares his own meals, helps take care of his grandchildren and dog, shops in stores, and handles money [Tr. 127–129, 151–153]. It is also significant that . . . he rides a bicycle [Tr. 127, 129, 151, 153], which is inconsistent with the alleged severity of his symptoms.

Tr. 41.

The ALJ found that these activities demonstrated that Amundson's condition was "not as severe as he alleged." Tr. 42. As the ALJ noted, Amundson "alleged that he has constant throbbing and aching pain in his right ankle and [both] feet and cannot stand up comfortably or walk more than one and one-half blocks without severe pain." Tr. 40. This allegation is inconsistent with Amundson's reports that he is able to shop for groceries, perform household

chores, and care for his grandchildren and dog. Additionally, Amundson alleged that his ankle pain prevented him from putting any weight on his left foot. Tr. 40, 135. This allegation is contradicted by Amundson's reports that he frequently commuted on his bike.[9] Tr. 40. The ALJ therefore properly supported his adverse credibility determination by identifying inconsistencies and contradictions between Amundson's complaints and his activities of daily living. *See Orn*, 495 F.3d at 639.

### C.    Work History

A claimant's work history, or lack thereof, can support an adverse credibility determination. *See Thomas*, 278 F.3d at 954. In this case, Amundson's work history is a clear and convincing reason for discounting his credibility. The ALJ determined:

> [T]he claimant has a poor work record, having last worked more than 25 years ago as a dishwasher, cook and bartender at a pizza restaurant from 1984 to 1985 [Tr. 115–118, 136–137, 143, 178–185]. Furthermore, he testified that while he did some work as a painter, woodcutter, and lawn mower, he did most of the work "under the table." Thus, he has shown little propensity to work, even when admittedly not disabled, and his failure to report his earnings or pay taxes thereon diminishes his credibility in general.

Tr. 42.

As discussed above, Amundson only reported earnings for three of the seven years preceding his ankle injury. Tr. 119. Amundson reported earning $243.41 in 1980 and did not report any earnings over the next three years. Tr. 119. Thus, the sum of Amundson's total reported earnings from 1980 to 1985 is only $3,494.70. Tr. 119. The ALJ was therefore entitled to discredit Amundson's pain and symptom testimony based on his work history, which was "spotty, at best, with years of unemployment between jobs, even before [he] claimed disability." *Thomas*, 278 F.3d at 959. To the extent that Amundson's dearth of reported income in the years

---

[9] Amundson did not claim that he rode his bike with only one leg, an unlikely possibility that the ALJ was entitled to reject. *See Batson*, 359 F.3d at 1193 (citation omitted) ("[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record.").

preceding his alleged disability onset date can be explained by his being paid "under the table,"

Amundson's dishonesty in failing to report his earnings and pay income taxes only further

supports the ALJ's adverse credibility determination. *See Tommasetti v. Astrue*, 533 F.3d 1035,

1040 (9th Cir. 2008) ("The ALJ may rely on ordinary techniques of credibility evaluation."),

*citing Smolen*, 80 F.3d at 1284.

## III.    Step Three: Listing of Impairments

Amundson next argues that the ALJ erred in determining that he did not meet the criteria

of the Commissioner's regulatory listing of impairments at sections 1.02 and 1.03. 20 C.F.R. pt.

404, subpt. P, app. 1, §§ 1.02–1.03. However, substantial evidence supports the ALJ's

conclusion that Amundson did not meet the regulatory standards for those impairments. At step

three of the sequential evaluation process, the claimant bears the burden of producing medical

evidence that establishes *all* of a listing's requisite medical findings. *See, e.g., Sullivan v. Zebley*,

493 U.S. 521, 530 (1990); *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005). Pain and

symptom allegations cannot substitute for missing objective signs or laboratory findings to

establish medical equivalency at step three. 20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3); SSR

83-19, 1983 WL 31248, at *2 (1983).[10]

In this case, Amundson failed to prove that he was unable to "ambulate effectively," and

consequently, he did not meet the listings at sections 1.02 and 1.03. *See* 20 C.F.R. Part 404,

Subpart P, Appendix 1 §§ 1.02, 1.03 (requiring ineffective ambulation for both listings).

"Ineffective ambulation is defined generally as having insufficient lower extremity functioning

. . . to permit independent ambulation without the use of a hand-held assistive device(s) that

---

[10] Social Security Rulings reflect the official interpretation of the Administration and are entitled to "some deference" as long as they are consistent with the Act and regulations. *See Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) (internal quotation marks omitted), *quoting Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n. 2 (9th Cir. 2005). Although they do not carry the "force of law," SSRs are binding on ALJs nonetheless. *See Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 & n. 6 (9th Cir. 1989).

limits the functioning of both upper extremities." 20 C.F.R. Part 404, Subpart P, Appendix 1 §
1.00B2b(1).

As noted above, Amundson does not require the use of any hand-held assistive devices.
Lang noted that although Amundson "uses no ambulatory aids such as a cane or crutches," he
merely walks "with a slight limp." Tr. 198. Indeed, neither Lang nor Eddy recommended that
Amundson use an ambulatory aid. Therefore, the ALJ properly concluded that "there is no
opinion or other evidence that the claimant's impairments meet or equal [any] listing." Tr. 39.

**IV.    Step Five: Whether a Person with the Claimant's Characteristics and RFC Could
         Perform Jobs Existing in Significant Numbers in the National Economy**

Amundson last argues that the ALJ erred at step five of the sequential evaluation by
failing to consider his lack of transferable work skills and limited education.[11] At step five, the
ALJ must identify "transferrable skills" that a claimant possesses before finding that the claimant
can perform skilled or semi-skilled jobs. SSR 82-41, 1982 WL 31389, at **5–7 (1982).
Therefore, transferability of skills is an issue only when the claimant's past relevant work has
been determined to be skilled or semiskilled. SSR 82-41, 1982 WL 31389 at *1. In this case,
the ALJ properly determined that "[t]ransferability of job skills is not an issue because the
claimant does not have any past relevant work." Tr. 43. Amundson does not contest the ALJ's
finding that he did not have past relevant work. Even if he did, the finding is supported by
substantial evidence, as discussed above. Moreover, all six representative occupations identified
by the ALJ were unskilled. Tr. 17–20, 43–44. Therefore, the ALJ was not required to identify
transferrable skills. *See* 20 C.F.R. § 404.1565(a); SSR 82-41, at *1.

Amundson's argument that the ALJ failed to consider his lack of education is similarly

---

[11] Amundson also argues that the ALJ erred at step five by "failing to consult a vocational expert." Pl.'s Opening Br.
2–3. This argument is without merit, as the ALJ consulted a vocational expert at the hearing and relied on the
expert's testimony in his written decision. Tr. 16–22, 43–44.

PAGE 20 – FINDINGS AND RECOMMENDATIONS

groundless. At the hearing, before the vocational expert determined whether Amundson could perform other work, the ALJ specifically asked the vocational expert whether he had heard all of the preceding testimony, which necessarily included testimony about Amundson's limited education. Tr. 5–6, 11, 16. Although the vocational expert answered in the affirmative, the ALJ nevertheless rehashed the testimony pertaining to Amundson's limited education—stressing that Amundson had a tenth grade education and only basic reading and writing comprehension. Tr. 16–17. Additionally, at the end of the vocational expert's testimony, the ALJ once more confirmed that the vocational expert had considered Amundson's lack of education. Tr. 21–22.

Moreover, Amundson's attorney specifically questioned the vocational expert about the educational requirements of the representative occupations he identified. Tr. 20–22. The vocational expert testified that none of the jobs required the worker to have a G.E.D. and that they all were within Amundson's ability to read and write. Tr. 20–22. Therefore, the ALJ did not err at step five of the sequential evaluation.

## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decision denying Amundson's application for SSI be affirmed. A final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a

///

PAGE 21 – FINDINGS AND RECOMMENDATIONS

copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 11th day of July, 2014.

Honorable Paul Papak
United States Magistrate Judge.